Filed 1/16/15  In re L.M. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.M., a Person Coming Under the Juvenile Court Law. | B253602 (Los Angeles County Super. Ct. No. CK96911) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>TANYA M.,<br><br>        Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County.  Annabelle G. Cortez, Judge.  Affirmed.

        Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant.

        No appearance for Plaintiff and Respondent.

_____

Tanya M. (Mother) appeals from the juvenile court's December 27, 2013 dispositional order placing seven-year-old L.M. in the partial custody of Jose M. (Father). The dispositional order at issue here was based on a jurisdictional finding under Welfare and Institutions Code section 300, subdivisions (b) (failure to protect) and (d) (sexual abuse).[1] Mother contends that under section 361, subdivision (c)(1), Father failed to rebut the "presumption of detriment associated with" section 300 findings of sexual abuse by parental grandfather, and therefore L.M. should have been removed from Father's care.

Father is not a party to this appeal. The Department of Children and Family Services (DCFS) does not oppose Mother's challenge to the dispositional order, but has not filed a separate brief.

Because substantial evidence supported the juvenile court's dispositional order, we affirm the order placing L.M. in the partial custody of Father.

## BACKGROUND

### The section 300 petition

On December 12, 2012, DCFS filed a petition on behalf of L.M., who was then six-years old, alleging she was a child described under section 300, subdivisions (a) (physical abuse), (b) (failure to protect), and (d) (sexual abuse). The petition alleged under section 300, subdivision (a), that paternal grandfather physically abused L.M. when he pulled her hair, ears, legs, and arms, and that Father knew of paternal grandfather's physical abuse and failed to protect her. The petition also contained a count of physical abuse and failure to protect under section 300, subdivision (b). The allegations pertaining to physical abuse were eventually dismissed. As amended and sustained on December 27, 2013, the petition alleged under section 300, subdivisions (b) and (d) that on prior occasions paternal grandfather sexually abused L.M. by fondling her vagina and Father knew of paternal grandfather's sexual abuse of L.M., but failed to protect her.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

**Events leading up to filing of the section 300 petition**

On November 30, 2012, DCFS received a referral based on a November 29, 2012 call to the Child Abuse Hotline that L.M. had been neglected by Father and paternal grandmother. The referral reported that L.M. did not want to live with her paternal grandparents anymore because paternal grandfather yelled at her and paternal grandmother, paternal grandmother talked "bad" about Mother and encouraged her to injure herself so that Mother could be blamed for the injury, and paternal grandmother put a pink substance on her legs to remove her hair. The referral also reported paternal grandfather's excessive drinking. Mother disclosed that she had moved away from the Fresno area because there were allegations that paternal grandfather had inappropriately touched L.M., although those allegations were unsubstantiated upon investigation because L.M. was "*too afraid to say anything*."

DCFS conducted several interviews, whose substance it reported to the juvenile court. We now summarize those reports.

Mother and Father divorced in 2008. Mother lived in West Covina with her new husband and L.M; Father lived in Fresno with paternal grandparents. Mother reported that in 2011, L.M. had told her that paternal grandfather "'tickled and touched her private parts.'" The ensuing investigation was closed in 2011, which Mother attributed to L.M.'s being afraid to say anything at her interview.

Pursuant to a family court custody order issued in November 2011, Mother and Father shared custody of L.M., with Father having custody every other weekend. The family court also ordered that L.M not be left unsupervised with paternal grandfather due to the prior sexual abuse allegations.

Despite the family court's order, L.M. "disclosed being left alone with her paternal grandfather." L.M. reported that when she visited Father, she stayed with him at the home of paternal grandparents and slept with Father in his bed. She also reported that Father left her in the care of paternal grandparents when he went to work, despite a family court order prohibiting such unsupervised contact with paternal grandfather.

3

L.M. also told DCFS that paternal grandfather "'put his hand inside [her] pants'" and touched her genital area. He pressed his fingers on her "'butt' area," which hurt because he had sharp nails. L.M. could not recall the last time paternal grandfather touched her, but believed he did it when she was "about 3 to 4 years old." She did not like going to paternal grandparents' home because paternal grandfather "'does bad stuff'" like pulling her hair, ears, legs, and arms, and poking her eye. L.M. further disclosed that while paternal grandfather was watching television with her on one occasion, he put his hand under her dress and touched her vagina "'with his finger and hard nail and it hurt. He did it more than one time.'" L.M. told Father that paternal grandfather touched her and she heard Father tell paternal grandfather "'"not to . . . be doing that anymore."'"

Father, paternal grandmother, and paternal grandfather denied that paternal grandfather had sexually or physically abused L.M. Father acknowledged that the family court ordered that L.M. could not be left alone with paternal grandfather, but apparently thought that the order allowed him to leave L.M. with the grandparents as long as paternal grandmother was present. He explained that when he worked on Saturdays, he left L.M. in the care of paternal grandparents, "'mostly my mom, she takes [L.M.] with her everywhere she goes.'" He admitted that "he could not know for sure" whether or not L.M. was left unsupervised with paternal grandfather. He indicated that he would be willing to move out of his parents' home and had been planning to do so before the referral.

**The detention hearing and subsequent events**

At the detention hearing on December 12, 2012, the juvenile court placed L.M. in the home of Mother and ordered Father to have unmonitored visits in Los Angeles County, including overnight visits. Regarding contact with paternal grandparents, the court ordered visits by paternal grandmother monitored by DCFS and not Father, but precluded paternal grandfather from having any contact with L.M. Finally, the court ordered family maintenance services for L.M., Mother, and Father.

Subsequently, L.M. enrolled in counseling, but was discharged from the counseling program in June 2013 "due to [Mother's] lack of compliance." Mother

4

believed L.M. did not need counseling and relocated L.M. to Las Vegas, without informing the social worker. Mother failed to appear at a hearing on August 28, 2013, and did not return DCFS's calls to arrange transportation for her from Fresno, where she was visiting relatives.

On August 28, 2013, the juvenile court issued a protective custody warrant for L.M., requiring her to be brought to court when located. DCFS left a message for Mother that if she did not appear in court on August 29, 2013, the court would issue an arrest warrant for her. When Mother failed to appear on August 29, 2013, the court issued an arrest warrant for Mother. After Mother contacted DCFS on November 4, 2013, the court recalled the protective custody warrant and arrest warrant, and released L.M. to Mother.

On December 17, 2013, Mother informed DCFS that she was living in West Covina with her brother and hoped to be moving into her own home soon. L.M.'s social worker confirmed that L.M. had already attended two counseling sessions as of December 17, 2013.

After several unsuccessful attempts to contact Father, DCFS interviewed him on January 28, 2013. The social worker discussed with Father his failure to enroll in any court-ordered program and his limited contact with L.M. Father blamed lack of transportation, financial difficulties, and lack of a place to stay in the Los Angeles area for these failures. Father indicated an interest in taking classes on the Internet, but DCFS would not accept an Internet class. The social worker concluded that "at this time," L.M. was not Father's "priority," given Father's failure to attend classes and keep in contact with DCFS.

By April 2013, Father had moved out of paternal grandparents' home into the home of his girlfriend and her mother, also in Fresno. L.M. still slept in Father's bed when she visited him in Fresno. In an April 15, 2013 interview, Father stated that while he was looking for day care facilities, his girlfriend's mother was available to watch L.M. Father still had not enrolled in any court-ordered program. At a hearing on April 2, 2013, the court ordered DCFS to provide bus passes to Father. DCFS reported in July

5

2013 that it had requested transportation funds for Father, but on December 27, 2013, DCFS reported that it had been unsuccessful in securing that funding.

**The December 27, 2013 jurisdictional and dispositional hearing**

The jurisdictional hearing was continued several times, in part because Mother failed to appear at hearings between August 28 and October 3, 2013. The juvenile court conducted a combined jurisdictional and dispositional hearing on November 25, 2013, December 18, 2013, and December 27, 2013.

At the hearing, Father testified that when the sexual abuse allegations were made in 2011, he immediately moved out of paternal grandparents' house so that he could have visitation with L.M. He further testified that the family law court allowed him to move back in with paternal grandparents on the condition that paternal grandfather not be allowed unsupervised visits with L.M. He began working in July 2012, leaving L.M. in the care of paternal grandmother. Father testified that after the allegations surfaced in the current DCFS case, paternal grandfather had no contact with L.M.

Although he did not believe paternal grandfather had sexually abused L.M. and believed that the sexual abuse accusations were the product of Mother's trying to restrict his visitation rights, he was "open minded to find out the truth." He stated, "[W]e are here for a reason. . . . I am trying to find out the truth to make sure my daughter is safe and protect my daughter, if I need to." He explained that he and his girlfriend had moved out of her mother's house and were living together in a one-bedroom house in Fresno, and that L.M. would have her own bed. Father stated that he was willing to comply with court orders that paternal grandfather have no contact with L.M. "as long as I need to," even if it is "until she is 18." He also said that he was also willing to comply with orders that paternal grandmother have monitored visits with L.M.

After argument of counsel, the juvenile court determined L.M. to be a dependent child and sustained the section 300 petition, as amended to delete the allegations under subdivisions (a) and (b) regarding physical abuse. It thus found by a preponderance of the evidence that paternal grandfather had sexually abused L.M. and that L.M. had told her Father about the sexual abuse and he had failed to protect her.

6

At the dispositional hearing, counsel for L.M. requested continued jurisdiction because Mother had stated she did not believe L.M. needed therapy and had been inconsistent in enrolling L.M. in therapy. Counsel for L.M. argued that L.M. should not be removed from Father's care because Father was credible, he was willing to follow the juvenile court's orders to keep L.M. safe, and L.M. needed Father "in her life, and . . . misses him very much."

Significantly, counsel for L.M. argued to the juvenile court that "we do not have the burden for clear and convincing evidence to remove from the Father today" and that she found Father credible because "[h]e had long pauses" when asked about whether he believed the sexual abuse had happened. Counsel for L.M. credited Father's willingness to comply with the court's orders, and the court's ability to protect L.M. both through its continued jurisdiction and ordering of joint counseling for Father and L.M.

Arguing that Father had violated the family court's orders, denied the sexual abuse, and demonstrated that he would not follow court orders, DCFS requested that L.M. be removed from Father's care. In the alternative, DCFS requested the juvenile court to impose the conditions of the detention order allowing Father overnight visits in Los Angeles, order DCFS to provide transportation assistance, and order Father into sexual abuse awareness counseling.

Mother asked for sole legal and physical custody, overnight and weekend visits for Father in Los Angeles County, no contact with paternal grandfather, and sexual abuse awareness counseling for Father. Father asked that the matter be closed, with a family law order in place giving joint legal and physical custody to Mother and Father, or that L.M. be placed in the care of Father. He objected to visitation rights only in Los Angeles County.

The juvenile court declared L.M. a dependant of the court and continued jurisdiction because of the sustained allegations of sexual abuse and Mother's inconsistency in ensuring that L.M. attend therapy. In refusing to remove L.M. from Father's custody, the juvenile court observed that "there are reasonable means by which

7

to protect without removing her from the Father," and "reasonable services that must be put in place to ensure that [L.M.] is safely at home with the Father."

The juvenile court noted that Father was no longer living with paternal grandfather and ordered that paternal grandfather not be present when L.M. visits Father and that there be monitored visitation for paternal grandmother. The court further noted Father's willingness to "abide" by these orders. The juvenile court ordered that the parents have physical custody under DCFS supervision, with primary custody in Mother's home, and that Father's visitation rights should not be geographically limited to Los Angeles County. The juvenile court ordered that paternal grandfather have no contact with L.M., and Father agreed to abide by that order. Father was ordered to provide a separate bed for L.M., and DCFS was ordered to verify within two weeks that paternal grandfather was "not in Father's home."

The juvenile court ordered a panoply of counseling: individual counseling for Mother, individual and conjoint counseling for L.M.; and individual counseling, sexual abuse awareness counseling, and conjoint counseling for Father. Finally, the juvenile court ordered Father and Mother that they could not change their own or L.M.'s address without notifying the court and that L.M. could not be taken outside the seven Southern California counties except when L.M. was visiting Father in Fresno County, where he was living.

DCFS and Mother objected to the juvenile court's release of L.M. to Father and visitation in Fresno, and requested a stay of the court's order. The court denied the request and once again ordered DCFS to verify within two weeks that Father had a separate address from paternal grandfather's residence and that L.M. had a bed of her own in her Father's residence. The court reiterated its finding that there are "reasonable services to keep [L.M.] at home safely."

Mother appeals from the juvenile court's dispositional order.

**DISCUSSION**

**Substantial evidence supported the juvenile court's dispositional order**

We conclude that substantial evidence supported the juvenile court's dispositional order placing L.M. in the partial custody of Father.

In order to remove a dependent child from a parent's home, the juvenile court must find by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The heavy burden of clear and convincing evidence protects the fundamental right of a parent to retain custody of a child; thus, removal under section 361 occurs under "'only extreme cases of parental abuse or neglect.'" (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1656.)

Mother argues that the juvenile court's jurisdictional findings are prima facie evidence that L.M. cannot safely remain in Father's custody, creating a rebuttable presumption of detriment were L.M. returned to Father's custody, and that "no substantial evidence rebutted the presumption of detriment" arising from the jurisdictional findings. Mother relies on the reference in section 361, subdivision (c)(1) to a minor's having been "adjudicated a dependent child" being "prima facie evidence that the minor cannot be safely left in the physical custody of a parent," and *In re Noe F.* (2013) 213 Cal.App.4th 358 for this proposition.

We observe that Mother takes the reference to "prima facie" evidence out of context. Section 361, subdivision (c)(1) provides in pertinent part: "The fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left in the physical custody of the parent . . . with whom the minor resided at the time of injury." The full text thus reveals that the reference to "prima facie" evidence in section 361,

subdivision (c)(1) is to adjudications under section 300, subdivision (e),[2] which was not the basis for the jurisdictional findings here. *In re Noe F.* does not assist Mother either because that case involved two incarcerated parents and the custody issues centered on the trial court's failure to make the findings required by section 361.2, also not at issue here. (*In re Noe F.*, *supra*, 213 Cal.App.4th at pp. 368–369.)

We review the dispositional orders regarding removal for substantial evidence. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) "'"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.]" (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259.)

We observe that at the dispositional hearing counsel for L.M. expressly requested that L.M. not be removed from Father's care and argued that L.M. missed and needed Father, who was credible and willing to comply with all court orders. Mother disagreed because despite a family court order to the contrary, Father "continued to leave [L.M.] with the paternal grandfather when he went to work." Father made no effort to participate in services and did not return calls from DCFS; Father "refused to meaningfully consider the possibility that [L.M.] had actually been victimized by the paternal grandfather." Mother argued based on these past actions that Father will not prevent paternal grandfather from seeing L.M. in the future.

To the extent Mother asks us to reweigh the evidence and assess Father's credibility, we cannot do so. The juvenile court appeared to credit Father's testimony expressing his appreciation of the seriousness of the sexual abuse charges, the potential

---

[2] Briefly summarized, section 300, subdivision (e) applies to a child under the age of five, who has suffered severe physical abuse by a parent or by any person known by the parent.

10

danger to L.M., and the importance of complying with court orders. In making its orders, the court repeatedly emphasized that paternal grandfather was not to have any contact with L.M. and received Father's assurance that he would comply with court orders. The court also observed Father was now living in his own home, separate from paternal grandparents, and that unlike before, L.M. would have her own bed.

In addition, there was substantial evidence that reasonable means existed to keep L.M. safe short of removal from Father's care. The challenged dispositional order required paternal grandfather to have no contact with L.M. and L.M. to have only monitored visits with paternal grandmother. In accordance with the order, Father was living in a residence separate from paternal grandfather, and DCFS was required to confirm Father's living arrangements within two weeks of the hearing. Father was also ordered to participate in individual, sexual abuse awareness, and conjoint counseling. If Father failed to comply with orders to keep paternal grandfather away from L.M. or to participate in counseling, the juvenile court, which retained jurisdiction, had the ability to limit Father's visitation with, or care of L.M. pursuant to a petition for modification of orders under section 388. As another safeguard, L.M. was placed in the primary care of Mother.

For all these reasons, we conclude that substantial evidence supported the dispositional order here placing L.M. in the partial custody of Father.

## DISPOSITION

The juvenile court's December 27, 2013 dispositional order is affirmed.

NOT TO BE PUBLISHED.


                                                        BENDIX, J.*

We concur:


        CHANEY, Acting P. J.


        JOHNSON, J.

---

        * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to art6icle VI, section 6 of the California Constitution.